**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **NICHOLAS SCHIFINO,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **2:11-cv-1094** |
| **v.** | ) |
| | ) |
| **GEICO GENERAL INSURANCE COMPANY,** | ) |
| *a corporation*, **ALLIED INSURANCE** | ) |
| **COMPANY** and **ELECTRIC INSURANCE** | ) |
| **COMPANY**, | ) |
| | ) |
| **Defendants.** | ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Nicholas Schifino commenced this lawsuit on August 15, 2011 by filing a four-count Complaint in the Court of Common Pleas of Allegheny County, Pennsylvania against Geico General Insurance Company ("GEICO"), Allied Insurance Company ("Allied") and Electric Insurance Company ("Electric") in which he seeks underinsured motorist ("UIM") benefits pursuant to automobile insurance policies issued by each Defendant. Plaintiff alleges that each Defendant has breached its contractual duties (Counts I, III, and IV) and that GEICO has engaged in bad faith (Count III) in violation of 42 PA. CONS. STAT. ANN. § 8371. GEICO removed the action to this Court on August 24, 2011 on the basis of diversity jurisdiction.

GEICO ultimately moved for summary judgment on the bad faith claim. The Court heard oral argument from counsel on December 7, 2012 and denied that motion one week later in a Memorandum Opinion and Order. (ECF No. 49).

By Order of Court dated March 15, 2013, the UIM claim was bifurcated from the bad faith claim for the purpose of trial. This case was initially scheduled for a jury trial, but the parties later waived that right.

On June 10 and 11, 2013, the Court conducted a non-jury trial in which it heard witness testimony and evidence. All parties were represented by counsel who presented and argued the issues skillfully and effectively. The transcripts of the proceedings were filed of record. Proposed Findings and Facts and Conclusions of Law were due on or before July 9, 2013 with responses thereto due on or before July 23, 2013. Those filings were timely made by Plaintiff and GEICO with which Allied and Electric joined in full. *See* ECF Nos. 113, 114. Accordingly, the issues are ripe for disposition.

Based on the testimony and evidence presented during trial and the applicable law, the Court enters the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).

## I.    BACKGROUND

### A. JOINT STIPULATIONS

1. The parties have filed of record Joint Stipulations (ECF No. 91) in which they set forth the following:

a. Plaintiff was involved in a motor vehicle accident that occurred on October 26, 2009 at the intersection of Frankstown and Rodi Roads in Penn Hills Township;

b. At the time of the collision, Plaintiff was a passenger in a 2007 Dodge Ram Pick-up Truck owned by John B. Derubeis and operated by Jeffrey Derubeis. The collision occurred when they were struck from behind by a 1998 Dodge Dakota operated by Andrew Hurayt ("Hurayt");

c. Hurayt was negligent in causing the accident;

d. Plaintiff sustained personal injuries as a result of the collision;

e. At the time of the collision, Hurayt was insured by a motor vehicle insurance policy issued by Erie Insurance Company ("Erie");

f. The Erie policy provided for $50,000.00 in liability insurance coverage.

g. The truck operated by Jeffrey Derubeis was insured by GEICO which provided UIM coverage in the amount of $300,000;

h. Plaintiff was a resident relative of Karen Vargecko and Mark Vargecko who, at the time of the collision, were insured by Allied which provided UIM coverage in the amount of $100,000;

i. Plaintiff was a resident relative of Tina Long who, at the time of the collision, was insured by Electric which provided UIM coverage in the amount of $100,000;

j. Provisions in both the Allied and Electric policies reflect that when their respective policies are in equal priority to any other policy, the UIM coverage available to any insured cannot exceed the amount by which the highest limit for any one vehicle under any one policy in the second priority exceeds the limit applicable under the policy in the first priority, meaning that the Allied and Electric policies have maximum exposure of $50,000 each for potential UIM liability;

k. GEICO is the first priority source of underinsured motorist benefits for Plaintiff;[1]

l. Plaintiff does not have any automobile insurance of his own and is considered to have "full-tort" coverage;

m. The medical expenses claimed by Plaintiff in this lawsuit total $78,028, and the parties agree that the amount of the medical charges are fair and reasonable;

n. All of Plaintiff's medical records and bills are authentic;

---

1. These UIM coverage policies would only have effect if Plaintiff were to receive an award in excess of $300,000.

o.  All of the medical witnesses who testified are qualified as experts in their respective fields; and

p.  The issues to be decided [in the UIM phase of this case] are the extent of the injuries sustained by the Plaintiff in the accident, the extent to which the injuries are compensable, and the amount of the medical bills for which Defendants must compensate Plaintiff.

2.  The Court accepted and admitted these Joint Stipulations into evidence during the non-jury trial. *See* Trial Tr., ECF No. 115 at 3-4.

**B.  ISSUES BEFORE THE COURT**

3.  For Plaintiff to recover UIM benefits for damages as a result of the motor vehicle accident, he must establish that Hurayt was negligent; that he sustained damages; that such negligence caused his damages; that the amount of the liability insurance of Hurayt was inadequate to fully compensate Plaintiff for his injuries and damages; that the defendant insurance companies issued policies of automobile liability insurance coverage which afforded UIM coverage and remained in full force and effect on the date of the accident.  The parties have stipulated to the liability and coverage aspects of the claim, but dispute the extent to which the post-accident medical treatment of Plaintiff is related to the October 2009 collision.  Defendants submit (1) that they are responsible for the medical expenses and damages related to the first post-accident back surgery (a lumbar laminectomy and fusion procedure performed in February 2010); (2) that they should not have to pay the expenses and damages associated with the second post-accident back surgery (an interbody fusion performed in February 2011 because the February 2010 fusion attempt failed) to which they argue that Plaintiff failed to mitigate his damages by stopping smoking—a significant factor in the development of pseudoarthrosis or failed fusions; and (3) that they are not responsible for his third post-accident surgery (a

laminectomy and fusion performed in February 2012) to which they contest that Plaintiff's neck/cervical injuries are causally related to the accident.

4. Additionally, Plaintiff contends that GEICO acted in bad faith by failing to conduct a proper investigation into his UIM claim or make an appropriate, justified, and timely settlement offer in the handling of his UIM claim. The parties dispute whether any recovery by Plaintiff in an amount greater than the offer but less than the demand constitutes bad faith.

5. The Court will separately address the UIM and bad faith aspects of this case. For the reasons that follow, the Court will find in favor of Plaintiff and against GEICO in the UIM phase, in favor of Allied and Electric and against Plaintiff, and in favor of GEICO and against Plaintiff in the bad faith phase.

## II. THE UNDERINSURED MOTORIST PHASE

### A. FINDINGS OF FACT

#### i. Plaintiff's Background & Pre-Accident Condition

1. Plaintiff is a fifty-nine (59) year-old male and a resident of Penn Hills Township, Pennsylvania. Plaintiff has a high-school education and some vocational training. He is divorced with two adult daughters and two grandchildren.

2. Plaintiff worked as an automobile mechanic for various dealerships until 1992 when he sustained an injury during the course of his employment at Dodgeland that ultimately ended his career. At that time, as Plaintiff was running through the garage to retrieve a tool he struck his head against the tire of an elevated vehicle. The impact resulted in chronic neck and back injuries that affected his ability to stand or sit for prolonged periods. Plaintiff filed a claim for disability benefits with the Social Security Administration the following year.[2]

---

2. Plaintiff never worked again after the accident; he continues to receive Social Security disability benefits.

3. Plaintiff later sought surgical treatment for the work-related injuries. The nature of his pre-accident treatment is generally not in dispute.

4. In 1994, Plaintiff underwent a C7-T1 laminectomy, foraminotomy and decompression on the left at C-8, performed by Dr. Jorge Acevedo at Shadyside Hospital. Following this surgery, Plaintiff received additional treatment from Dr. Acevedo for lower back and neck pain.

5. Dr. Acevedo again performed surgery on Plaintiff in 2000 to treat a herniated disc in his lower back at L-4–L-5. Plaintiff continued his treatment for neck and back pain after the second surgery in 2000, which initially included only physical therapy but later progressed to pain management therapy with Dr. Paul Lieber around 2001. Dr. Lieber's treatment consisted of injections/prolotherapy and narcotic medications. Plaintiff remained under the care of Dr. Lieber until around April 2006.[3]

6. Beginning in 1998, Plaintiff was also under the care of his primary care physician Dr. Gregory Smith who is board certified in internal medicine. Dr. Gregory Smith treated Plaintiff until 2010 when he became Vice-Chair of the Department of Family Medicine at UPMC, which required additional administrative work and reduced clinical hours. Plaintiff presented the expert testimony of Dr. Gregory Smith at trial via his video deposition. The Court found his testimony credible.

---

3. There is uncontroverted testimony that Plaintiff then attended the UPMC Pain Clinic for treatment but was dismissed because he abused his medications. The Court will not consider any evidence of his alleged past drug abuse in making any finding of fact or conclusion of law, as Plaintiff no longer claims damages for permanent injury. *See* ECF No. 88 ("[Because] Plaintiff will be unable to prove any permanency with regard to his accident-related injuries, life expectancy is not an issue and evidence of substance abuse would no longer be relevant."). Accordingly, the Court will grant the Amended Motion in Limine to Preclude Evidence of Substance Abuse (ECF No. 88).

7.  Dr. Gregory Smith has treated Plaintiff for his chronic neck and back pain and for a litany of other medical issues: hypertension, coronary artery disease, fibromyalgia, and tobacco use.[4] Plaintiff also suffers from multiple sclerosis and diabetes, and Dr. Gregory Smith coordinates his care for those conditions.  Plaintiff has visited Dr. Gregory Smith on twenty to thirty occasions, and his complaints typically focused on chronic neck and back pain, myofascial/musculoskeletal-type pain symptomatic of fibromyalgia, and some radicular pain into his left arm.  The severity of Plaintiff's symptoms fluctuated throughout these visits, but they were fairly controlled with a combination of prescription medication and pain management treatment.

8.  Around late 2001, Plaintiff completed a questionnaire for the Social Security Administration ("SSA") as part of a recertification process, attesting that he remained totally disabled and unable to perform most activities of daily living.

9.  In addition to the 1992 accident, Plaintiff has had other orthopedic injuries such as a neck fracture in June 2003 from a fall down the steps at his residence.  Plaintiff attributes this accident to a loss of consciousness immediately before the fall.

10. Plaintiff later underwent a posterior decompression with foraminotomies performed by Dr. Bonarati in August 2006.

11. From late 2007 until October 2009, Plaintiff experienced only minor neck and back discomfort with soreness throughout those areas.  Complaints of radicular pain continued during this time, but the symptoms were basically controlled with prescriptions for NSAIDS and opiates.  This treatment also allowed for increased functioning, as compared to the restricted lifestyle that he reported when he completed the SSA questionnaire.  Plaintiff could now walk

---

4.  Dr. Gregory Smith testified that Plaintiff had moderate to severe degenerative disc disease in his neck and back and had issues with depression, anxiety, fatigue, and sleeplessness before the 2009 automobile accident.  The record is unclear if Dr. Gregory Smith treated Plaintiff for all of these additional maladies.

unimpeded, take the garbage out, cut the grass, and go fishing, although he considered himself still somewhat limited in those activities.

12. Plaintiff likewise experienced pre-accident symptoms from his multiple sclerosis and fibromyalgia. The symptoms he attributes to his multiple sclerosis are "hot and cold" sensations in his hands and feet as well as some slight vision loss. The symptoms he attributes to his fibromyalgia include diffuse pain, some muscle aches, and burning/stinging of the skin. Plaintiff experiences occasional flare-ups related to fibromyalgia, such as when he went to the emergency room at UPMC St. Margaret Hospital in September 2009 for treatment of arm and neck pain that resolved with intravenous medication.

13. Plaintiff has been a lifelong cigarette smoker, beginning when he was twelve-years-old. Plaintiff typically smoked one pack per day, but has reduced his intake on occasion to as little as three cigarettes per day and tried to quit smoking completely for about six months. As of the date of his testimony, Plaintiff was still smoking approximately one-half pack per day.

ii. <u>The Motor Vehicle Accident</u>

14. Plaintiff was a passenger in Derubeis' truck when they were struck from behind by a vehicle driven by Hurayt near a traffic light in Penn Hills Township.

15. The force from the impact caused Plaintiff to strike his head on the door handle and then hit his face on the dashboard. Plaintiff attributes his movement inside the vehicle to the locking retractor on his seat belt failing to engage.

16. Shortly after the accident, Plaintiff pronounced that he was seriously injured and requested that someone call an ambulance. Plaintiff testified that his immediate post-accident symptoms included a tingling sensation over one side of his face and down his neck as well as

pain down both of his arms.  Plaintiff was not cut or bleeding anywhere after the collision and has not sought treatment for any related head injury.

17. Paramedics from Jeannette EMS eventually arrived on scene and transported Plaintiff to Forbes Regional Hospital, which was not accredited as a Level II trauma center at that time. There, Plaintiff experienced some numbness in both arms that apparently raised some concerns among his medical providers.

18. Plaintiff was transferred to Allegheny General Hospital ("AGH"), a Level I trauma center, for further treatment that same day.  At AGH, Plaintiff underwent numerous diagnostic studies and stayed for observation until his discharge on October 28, 2009.

19. The parties dispute the significance of the evidence and testimony offered on the degree and extent of the property damage.

20. GEICO presented the deposition transcript of Hurayt.[5]  Hurayt testified that he was initially stopped behind Derubeis' truck at a red light and followed him in making a left-hand turn when the light turned green.  As the trucks began to pull away from the light, Hurayt heard sirens and looked around to identify the source.  Hurayt then turned his attention back to the road as he entered the turn, and he struck Derubeis' truck while it was stopped for an oncoming emergency vehicle.  According to Hurayt, the collision occurred at a low speed.

21. The parties submitted photographs of the vehicles taken after the accident.  The pictures depict that Derubeis' truck was hit on the left rear bumper/quarter panel near the taillight by the direct front of Hurayt's truck.  At a superficial level, the damage to both vehicles appears minimal.

---

5.  This deposition was not taken in connection with this case, but rather in a third-party action in the Court of Common Pleas of Allegheny County in which Derubeis brought suit against Hurayt.  The parties in this case have agreed to submit the deposition into evidence.  *See* Trial Tr., ECF 116 at 4.

22. Plaintiff presented the testimony of Stuart Setcavage ("Setcavage") at trial via videotaped deposition.[6] Setcavage worked for State Farm Insurance for twenty-four years and passed the licensing exam to become a motor vehicle physical damage appraiser in 1989. Setcavage concluded that the damage to the vehicles was much more severe than that which the photographs otherwise depict and that the impact was significant. Setcavage based his opinion on a review of the damage estimates to the trucks and the photographs of the vehicles.

23. The Court found the testimony and evidence regarding the severity of the accident of questionable credibility and of minimal probative value in assessing the injuries and damages related to the collision. Rather, the Court finds that the medical evidence and testimony of qualified experts is better suited to address this issue.

### iii. Plaintiff's Post-Accident Medical Treatment & Condition

24. Plaintiff followed-up his hospital stay with a November 24, 2010 visit to Dr. David Cohen, a neurosurgeon, based upon a referral by AGH. Plaintiff does not recall whether Dr. Cohen prescribed or recommended any treatment, but he does remember visiting with Dr. Gregory Smith fairly soon after the accident.

25. Plaintiff visited with Dr. Gregory Smith on December 22, 2009 where he complained of significant neck and back pain and limited mobility since the accident in late October. Plaintiff described his neck pain as "knife-like," radiating into his arms and hands with associated electric sensations. He described his lower back pain as radiating into both legs and into his right foot and reported some numbness in his left leg. Dr. Gregory Smith testified that Plaintiff was in

---

6. The Court limited the scope of Setcavage's testimony to his property damage assessment and precluded him from opining on the issue of bad faith. *See* Mem. Order, ECF No. 85 (granting the motions in limine to preclude the parties from offering expert testimony on the bad faith claim at trial). At his deposition, GEICO objected to Setcavage's testimony based on his lack of personal knowledge and his reliance on unauthenticated estimates prepared by other appraisers to reach his conclusions. Counsel for Plaintiff indicated that he would authenticate the appraisals, but the record is unclear if that was ever accomplished.

more pain at this visit than on any previous occasion and that the type of pain was different with the radicular pain in both of his arms and legs as well as the electrical sensations. Dr. Gregory Smith opined that the accident led to the increased pain.

26. Dr. Gregory Smith referred Plaintiff to Dr. Patrick Smith, a board certified orthopedic surgeon, for further evaluation and treatment of his post-accident symptoms.[7] Plaintiff presented the expert testimony of Dr. Patrick Smith at trial via his videotaped deposition. The Court found his testimony credible.

27. Dr. Patrick Smith first met with Plaintiff on January 2010 where Plaintiff complained of bilateral leg pain and pain in his neck, arm, and lower back. Dr. Patrick Smith physically examined Plaintiff and performed diagnostic studies. The X-rays revealed an asymmetric collapse at the L-4–L-5 level and evidence of prior surgeries. Based on the medical history, examination and X-rays of Plaintiff, Dr. Patrick Smith assessed that the accident aggravated Plaintiff's underlying degenerative changes and ordered an MRI scan.[8]

28. Plaintiff underwent an MRI scan of his back and returned to Dr. Patrick Smith on January 25, 2010. The MRI scan showed that there was moderate to severe stenosis at L-3–L-4 and L-4–L-5. At this visit, Plaintiff complained of continued pain in his back and down into his legs which Dr. Patrick Smith characterized as quite severe. Dr. Patrick Smith offered both non-operative and operative management options to Plaintiff who chose to undergo a lumbar laminectomy and fusion procedure.

29. Before the surgery, Dr. Patrick Smith informed Plaintiff that his smoking habit may compromise the outcome. Dr. Patrick Smith testified that the medical literature is well-

_____

7. Before the October 2009 automobile accident, Dr. Gregory Smith had never referred Plaintiff to an orthopedic surgeon or neurosurgeon to treat his complaints of pain.
8. At his deposition, Dr. Patrick Smith confirmed that numerous diagnostic studies performed before the accident revealed that Plaintiff had moderate to severe degenerative arthritis in his neck and back.

documented regarding the increased potential for delayed fusion in heavy smokers.[9]  Plaintiff continued to smoke.  Plaintiff testified that he only recalls Dr. Patrick Smith informing him that smoking would slow down the healing process but that he does not remember learning it could impact the chance of a successful fusion.  *See* Trial Tr., ECF No. 115 at 58 ("Q: Do you recall Dr. Patrick Smith saying anything to you about what effect smoking could have on the fusion surgery he was performing in February of 2010?  A: All that I can recall that Dr. Patrick Smith told me that I remember is he told me that it would slow down the healing process.  He didn't say anything to me, that I remember, about if I continued smoking that it would cut the chances of success of the screws coming loose from the fusion.  That I do not recall him saying that to me.").  Plaintiff testified that he would have tried to quit smoking had he known of the associated risks.

30. Dr. Patrick Smith performed the surgery on February 11, 2010.  The fusion was accomplished by inserting screws at L3, L4, and L5 to secure metal rods at those levels.  A bone graft was a necessary component of the procedure, requiring a separate incision near the hip.  Dr. Patrick Smith chose to harvest the bone from Plaintiff's iliac crest as opposed to a cadaver because studies show a definite decrease in the rate of a successful fusion among smokers when the cadaver is used.

31. Plaintiff remained in the hospital for approximately three days.  After his discharge, Plaintiff required home health care and substantial assistance with his daily activities.

32. Plaintiff visited Dr. Patrick Smith for a post-operative checkup three weeks later on March 2, 2010.  Plaintiff reported some back pain, but his discomfort focused more on the donor

---

9.  Dr. Patrick Smith did not quantify the extent to which smoking can compromise the outcome of this surgery. During Dr. Gregory Smith's deposition, he confirmed that there is well-accepted literature on this topic.  Dr. Gregory Smith testified that he did not advise Plaintiff to stop smoking because he was not present for the pre-op evaluation, but that he expected somebody would have informed Plaintiff of the risks.

site. The exam showed that his incision was healing, that he was intact from a neurological perspective, and that he was progressing as expected.

33. Plaintiff returned for another post-operative checkup on March, 23, 2010. At this six-week follow-up, Plaintiff complained predominately of neck pain. Dr. Patrick Smith decided to continue concentrating on his lower back before addressing this secondary issue.

34. Plaintiff returned for his third follow-up on May 4, 2010 at which he reported a clicking sensation. Dr. Patrick Smith conducted an X-ray that showed nothing exceptional. Almost one week later, Plaintiff went to the emergency room at UPMC St. Margaret Hospital complaining of neck and back pain.

35. By November 2010, Plaintiff was reporting increasingly worse pain in his lower back and some pain radiating around and towards his groin. These reports prompted Dr. Patrick Smith to repeat Plaintiff's X-rays.

36. The X-rays showed a halo effect around the surgical screws indicative of loosening. Dr. Patrick Smith diagnosed Plaintiff with a developing nonunion at the L-3–L-4 level.

37. Dr. Patrick Smith advised Plaintiff that they could adopt a "wait-and-see" approach or address the problem through an anterior lumbar interbody fusion. That procedure required removing the L3-4 disc, putting a bony graft into that space, and securing it with a metal cage. Plaintiff chose the surgical option.

38. Dr. Patrick Smith performed the operation on February 18, 2011 with the assistance of Dr. Kevin Garrett, a general surgeon. Dr. Garrett was responsible for making an incision through Plaintiff's side to expose the area necessary for the interbody grafting. That procedure led to an incisional hernia, a visibly noticeable bulge on Plaintiff's right side. After his discharge, Plaintiff again required home health care.

39. Plaintiff followed-up with Dr. Patrick Smith at an April 2011 visit where he reported incisional-type flank pain/numbness and still complained of persistent neck and back pain. Dr. Patrick Smith obtained X-rays which indicated that the grafts and screws remained well-placed; however, the second surgery did not result in significant relief for Plaintiff's back pain.

40. Plaintiff visited Dr. Patrick Smith on May 17, 2011 for another post-operative checkup. At this time, Plaintiff reiterated his earlier complaints and noted radicular pain on his left side. Dr. Patrick Smith referred Plaintiff to a pain management group for treatment. Plaintiff began treatment with Dr. Cicuto of ChoiceCare Physicians in June 2011 and remains under his care. Dr. Patrick Smith continues to monitor Plaintiff's lower back issues to ensure that the hardware does not cause any problems and that no further deformities develop, and he remains satisfied that Plaintiff is developing a solid lumbar fusion. There have not been any further developments relative to Plaintiff's lower back; however, he experienced additional complications with regard to his neck.

41. Plaintiff returned to Dr. Patrick Smith in January 2012 with complaints of increased neck pain radiating into both arms with numbness and tingling. Because of the change in Plaintiff's symptoms, Dr. Patrick Smith ordered a MRI scan of the cervical spine. The scan showed moderate stenosis at C-5–C-6 and C-7. As Dr. Patrick Smith testified, the stenosis likely existed before the accident.

42. Dr. Patrick Smith reviewed various options with Plaintiff who elected to proceed surgically rather than rely only on pain management treatment.

43. Dr. Patrick Smith performed a low-level anterior cervical discectomy and fusion on February, 24 2012. Plaintiff remained in the hospital for a few days following surgery.

44. On March 13, 2012, Plaintiff visited Dr. Patrick Smith for a checkup where he reported that his arm pain had mostly dissipated after the neck surgery except for some discomfort on the left side of his triceps. Dr. Patrick Smith sent Plaintiff to physical therapy and instructed him to follow-up as needed.

45. Dr. Patrick Smith opined that all three post-accident surgeries were medically reasonable and necessary and that the October 2009 accident caused all of the neck and lower back issues for which Plaintiff was treated. He also found that Plaintiff will continue to need pain management treatment for his accident-related neck/lower back symptoms for the next five to ten years. Dr. Patrick Smith based his opinion on causation upon MRI findings and the medical history/subjective complaints of pain relayed by Plaintiff, as opposed to relying on changes in the MRI findings or comparing diagnostic studies from before and after the accident to make that assessment.[10]

46. At trial, Plaintiff testified to his post-accident condition, comparing it to his activity level one to two years before the accident. Plaintiff certainly acknowledged his limitations before the October 2009 collision, but testified that the aggravation of his preexisting injuries from the accident have led to further constraints: he cannot go fishing or walk more than fifty (50) yards without severe pain; he cannot travel any significant distance without a walker; he cannot bend over anymore due to the fusion; and he cannot attend family outings at the zoo or amusement park due to the significant walking involved.[11] Plaintiff conveyed that his arm pain dissipated after the third surgery and that some neck pain and limitations on his range of motion remain.

---

10. Dr. Patrick Smith knew about the vast majority of Plaintiff's prior injuries and surgical procedures, but admitted that he was not aware of the 1994 operation performed by Dr. Acevedo.

11. Plaintiff attributes some of his difficulties in walking to multiple sclerosis-related symptoms. *See* Trial, Tr., ECF No. 115 at 64 ("Q: Before the accident how was your walking? A: Well, I believe it's from the multiple sclerosis, I have a tendency to walk sideways, that's why I use a cane."). There is no claim in this case that his multiple sclerosis was aggravated by the accident. *See id.* at 84 ("Q: You agree that your MS was not aggravated by this accident? A: No, I wouldn't say aggravated. Q: Your MS is about the same today as it was before the accident? A: Yes.").

Nevertheless, Plaintiff assessed that he is "doing great" overall since the last surgery. The Court found Plaintiff's testimony credible in many respects, but it has serious doubt as to the veracity of some of his statements—particularly his claim that Dr. Patrick Smith did not adequately advise him of the known risk that smoking would reduce the chance of a successful fusion.

47. Angela Schifino ("Ms. Schifino"), one of Plaintiff's daughters, testified at trial about her father's post-accident condition. Ms. Schifino visited Plaintiff once or twice per week in the months following the accident, observing that her father required substantial assistance in the most basic of daily activities due to his pain and immobility, that his complaints of pain became constant, that his range of motion deteriorated, and that his endurance declined. Ms. Schifino characterized these symptoms as "drastic changes" compared to his complaints of pain before the accident when she would visit him two to three times per month. From her perspective, Plaintiff suffered some emotional setbacks as well after the accident because he was limited in or precluded from doing those activities that he once enjoyed such as washing his car, cleaning his boat, acting as the neighborhood handyman and playing with his grandchildren. The Court found her testimony credible.

### iv. Independent Medical Evaluation

48. As part of this litigation, Plaintiff underwent an independent medical evaluation ("IME") on August 6, 2012 by Dr. John William Bookwalter, III, a board certified neurosurgeon. Defendants presented the expert testimony Dr. Bookwalter at trial via his videotaped deposition. The Court found his testimony credible.

49. At the IME, Dr. Bookwalter took a history from Plaintiff in which he related his current complaints and compared those symptoms to his pre-accident condition. Plaintiff told Dr. Bookwalter that he experienced occasional pain in his left arm and right leg before the accident,

characterizing his symptoms as muscle soreness treatable with prescription narcotics. Based on his history, Dr. Bookwalter found that the Plaintiff had chronic pain prior to the collision and that he was completely disabled before October 2009. The history also revealed that Plaintiff had increased complaints of pain after the accident, which prompted his numerous visits to the hospital and the need for more potent narcotic medication to control his symptoms. As Dr. Bookwalter confirmed in his testimony, some of this pain (*e.g.*, the radicular symptoms from his back into his legs) was different than the kind Plaintiff described to Dr. Gregory Smith in the years preceding the accident.

50. As part of the IME, Dr. Bookwalter reviewed all of Plaintiff's pre-accident medical records.[12] Among the diagnostic studies, Dr. Bookwalter noted that an April 2006 myelogram and CAT scan of Plaintiff showed high-grade stenosis, evidence of a prior procedure, and a possible recurrent herniation. Dr. Bookwalter similarly highlighted the treatment notes of Dr. Bonarati which indicated that Plaintiff had myelopathy in the cervical region, that it improved after the August 2006 surgery, and that his persistent symptoms were related to the underlying spinal cord injury.

51. Dr. Bookwalter reviewed Plaintiff's post-accident records and studies as well. Dr. Bookwalter testified that a cervical spine X-ray from January 2010 showed degenerative change with no instability or abnormal motion; that a lumbar spine X-ray from January 2010 showed no instability; and that the X-rays showed a slight scoliosis. Dr. Bookwalter found that there were no acute changes shown in the diagnostic studies that he would attribute to the accident. Dr. Bookwalter considered Dr. Cohen's records of Plaintiff in making his assessment. Dr. Cohen evaluated Plaintiff about one month after the accident, having noted relatively mild findings

---

12. Plaintiff objected to Dr. Bookwalter's reliance on these various medical records as inadmissible hearsay. The Court overruled the objection(s) at trial, finding that Dr. Bookwalter reasonably relied on those medical records in forming his opinion as an expert in this field.

consistent with Plaintiff's preexisting medical conditions rather than any evolving or active nerve root or spinal cord compression process. Dr. Cohen concluded that the accident aggravated his chronic complaints of pain involving the cervical and lumbar region.

52. Dr. Bookwalter conducted a physical examination of Plaintiff as part of the IME. The exam indicated that Plaintiff has about fifty-percent reduction in the range of motion in his neck and back; that his muscle groups were normal; that his reflexes were slightly diminished on the right; and that his sensation to pin in his legs and position sense were diminished. During the exam, Plaintiff reported that he continued to experience pain across his shoulders and underneath into his armpits. Dr. Bookwalter did not find any signs of symptom magnification or malingering.

53. Dr. Bookwalter ultimately opined that Plaintiff either aggravated his underlying degenerative disk disease or exacerbated his preexisting condition in the accident. In Dr. Bookwalter's opinion, he could not definitively conclude whether Plaintiff suffered an aggravation or exacerbation because Plaintiff underwent surgery too soon after the accident without adequate time to pursue the conservative therapy necessary to make that determination. Dr. Bookwalter nonetheless testified that Plaintiff suffered at least an exacerbation, which he characterized as more of a sprain/strain that is a usually a reversible injury. Dr. Bookwalter went further in his expert report, opining that Plaintiff aggravated his preexisting conditions as a result of the accident and the records provided to him identify a material change in his symptoms. Although Dr. Bookwalter did not agree with the immediate course of treatment, he noted that a fusion operation is a major surgery with risks of complications and a painful recovery period.

54. Dr. Bookwalter also opined that Plaintiff's continued smoking played a significant role in the failed fusion that led to the second post-accident surgery.[13]  According to Dr. Bookwalter, a failed fusion is a known complication of this surgery but smoking is the most significant factor in its development.  Dr. Bookwalter similarly noted that smokers are four times more likely to be symptomatic from degenerative disk disease and that ceasing can diminish pain complaints by about thirty percent.

55. Finally, Dr. Bookwalter opined that the cervical surgery performed by Dr. Patrick Smith in February 2012 (*i.e.*, the third post-accident procedure) was not related to the accident.  Dr. Bookwalter found the procedure too remote from the October 2009 accident and would have expected spinal cord findings had Plaintiff's underlying cervical spinal stenosis been aggravated. Much like his opinion on the appropriateness of the first post-accident surgery, Dr. Bookwalter disagreed with the decision to perform this last surgery.  When Plaintiff highlighted that his arm pain went away after the surgery—a fact he highlights to show that the surgery was appropriate and that his symptoms improved—Dr. Bookwalter responded that there is sometimes a placebo effect to surgery and that Plaintiff reported ongoing symptoms with regard to his neck at the IME.

### v.  Plaintiff's Injuries Related to the Accident

56. The parties do not agree on the extent of the Plaintiff's injuries caused by the accident. Of course, Plaintiff bears the burden of proving the extent of his damages caused by Hurayt's negligence and may recover even if his preexisting medical condition was aggravated by the accident.  The Court finds that Plaintiff aggravated his pre-existing neck and back conditions as a

---

13.  Plaintiff objected to Dr. Bookwalter's opinion on whether smoking attributed to the failed fusion as beyond the scope of his expert report.  The Court overruled that objection.  The Court also notes that Dr. Bookwalter initially submitted an expert report on August 6, 2012 and later supplemented it on September 3, 2012 after he reviewed a number of discs with radiographic studies received after the IME.

result of the October 26, 2009 motor vehicle accident, leading to increased complaints of pain and additional treatment.

57. The Court finds that the first post-accident surgery performed by Dr. Patrick Smith was medically reasonable, necessary, and related to the motor vehicle accident. This surgery is a major procedure with a very painful rehabilitation period during which Plaintiff was dependent on others for the basic activities of daily living for two-three months. Plaintiff was certainly disabled before the accident, but his daily activities are now much more restricted to include substantial limitations not present in the years immediately preceding the collision. GEICO acknowledges that it is responsible for this treatment and associated damages regardless of Dr. Bookwalter's opinion that it was not medically necessary. *See generally* RESTATEMENT (SECOND) OF TORTS § 457 cmt. c (1965).

58. The Court finds that the second post-accident back surgery performed by Dr. Patrick Smith was medically reasonable, necessary, and related to the motor vehicle accident due to the failed fusion. Accordingly, Defendants are responsible for the cost of that procedure and related damages unless they meet their burden of proof in showing that Plaintiff failed to mitigate his damages by continuing to smoke after the first post-accident surgery.

59. The Court finds that the third post-accident surgery performed by Dr. Patrick Smith was medically reasonable, necessary, and related to the motor vehicle accident. Dr. Patrick Smith stated that he performed the neck surgery to address Plaintiff's spinal stenosis at C-5–6 and C-6–7 and related complaints of pain.[14] Dr. Bookwalter, on the other hand, considered the surgery

---

14. As discussed above, Dr. Patrick Smith based his opinion regarding causation on Plaintiff's subjective complaints of pain and MRI findings. Dr. Patrick Smith acknowledged that the findings in the diagnostic studies predated the accident, but opined that Plaintiff's preexisting conditions and surgeries made him more susceptible to having symptoms. *See* Dep. Tr. of Dr. Patrick Smith at 69-70 ("Q: Does the fact that Nicholas had the prior surgeries and the stenosis and the arthritic changes that you talked about, does that make him more susceptible to having symptoms from a collision such as he was in in October of 2009? A: Yes. Q: Can trauma from such a

quite remote from the accident and testified that if Plaintiff's stenosis was aggravated due to the accident he would have expected to see spinal cord findings and for symptoms to manifest very quickly and progress over a period of time.[15]  The testimony and evidence demonstrates that Plaintiff immediately experienced neck pain which progressively worsened and that there were findings consistent with spinal cord or nerve root compression.  As Dr. Patrick Smith testified in refuting the findings in the IME report:

> I mean, the MRI shows that there's moderate stenosis in those areas.  Over time, he had neck pain, and he had some arm pain.  We addressed – his lower back was really the bigger issue initially.  As time went on, he continued to have these symptoms, but they got worse.  As time went on and it got worse, he then eventually started to address his neck.

> His MRI shows there is stenosis there.  His symptoms were consistent with it.  The post-operative course showed that removal of that pressure actually benefited him.  So overall, looking at those facts, I think – and I have nothing – other reason that would say why he would have these symptoms other than the motor vehicle accident.

> So overall, I don't see – I mean, it seems everything is adding up, to me.  Looking at all those facts, it seems like this was a reasonable treatment for him.  And he had, like I said, radiographic and diagnostic studies to confirm that he had stenosis going on.

Dep. Tr. of Dr. Patrick Smith at 34-35.  Accordingly, the Court finds that Plaintiff has shown by a preponderance of the evidence that the third post-accident surgery/related treatment was caused by the collision and that the extent of his damages includes the medical costs and noneconomic losses associated with this occurrence.

---

collision that he had, can that make pain that may be caused by arthritis or stenosis, can that make it hurt more?  A: Yes.  Q: Is that your opinion as to what happened with Nicholas?  A: It is.").

15.  Dr. Bookwalter acknowledged that Plaintiff had complaints of neck and arm pain after the accident, but opined that it was not spinal cord compression.  *See* Dep. Tr. of Dr. Bookwalter at 45.  Dr. Bookwalter later conceded that he could not tell whether Plaintiff's arm pain was from nerve root compression because no medical provider documented a correlation.

vi.  Mitigation of Damages

60. The law requires a person who is injured by the negligence of another to take all reasonable steps to minimize his damages, a principle set forth in the RESTATEMENT (SECOND) OF TORTS § 918. *See Yost v. Union R. Co.*, 551 A.2d 317, 322 (Pa. Super. Ct. 1988). Section 918 states that "one injured by the tort of another is not entitled to recover damages for any harm that he could have avoided by the use of reasonable effort or expenditure after the commission of the tort." RESTATEMENT (SECOND) OF TORTS § 918(1). The defendant bears the burden to make this showing. *Utz v. Johnson*, 04-CV-0437, 2004 WL 3828095, at *3 (E.D. Pa. Dec. 6, 2004) ("To prevail on a mitigation theory, defendant must show what reasonable measures plaintiff should have taken to reduce damages and that those measures would have reduced plaintiff's damages.").

61. Although the Pennsylvania courts have yet to address the issue of a plaintiff's failure to mitigate personal injury damages due to his refusal to stop smoking after suffering the injury, at least one federal district court has discussed this issue in the context of ruling on a motion in limine. *See Harley v. Makita USA, Inc.*, CIV.A. 94-4981, 1998 WL 156973, at *5 (E.D. Pa. Apr. 7, 1998); *see also id.* ("[T]he few courts that have confronted this question have found that smoking might constitute a failure to mitigate thereby requiring a reduction in the amount of recover[y].") (citing *Gideon v. Johns–Manville Sales Corp.*, 761 F.2d 1129, 1139 (5th Cir. 1985); *Blanchard v. Means Indus.*, 635 So.2d 288, 293-94 (La. Ct. App. 1994); *Coffin v. Board of Supervisors*, 620 So.2d 1354, 1366 (La. Ct. App. 1993)). In *Harley*, the district court forecasted that "[t]here is no reason to believe that the Pennsylvania Supreme Court would not apply [the mitigation of damages doctrine] to a scenario where a plaintiff fails to quit smoking, against the advice of his or her doctor." *Id.* To that end, the court concluded that "if the

defendant can show that an ordinarily prudent person would have quit smoking pursuant to [his doctor's] advice and that the plaintiff's failure to do so impeded his healing process, the defendant can offer evidence of the plaintiff's smoking habits as they relate to his injuries." *Id.* Accordingly, the district court left the issue for a determination by the factfinder.

62. Here, the Court finds that Defendants have met their burden and shown that Plaintiff should have taken the reasonable measure to quit smoking in order to reduce his damages. The Court recognizes that non-union may occur in non-smokers as well, that failed fusion is a known complication of the surgery in approximately five percent of cases, that the three and one-half months between the accident and fusion was not much time for someone who is a chronic smoker to quit, that it is very difficult to get patients with chronic medical conditions/pain to quit smoking, and that Plaintiff testified that he remembers Dr. Patrick Smith only advising him that smoking may delay the healing process—a feigned account from the Court's perspective. *See* Dep. Tr. of Dr. Bookwalter at 78; Dep. Tr. of Dr. Gregory Smith at 22. Nonetheless, the evidence and testimony also reveals that every expert witnesses acknowledged that the medical literature is well-documented regarding the effect smoking may have on the outcome of fusion surgery, that Dr. Patrick Smith spoke with Plaintiff about the fact that it may compromise the outcome, and that Dr. Bookwalter thought that smoking played a significant role in the failure of his fusion. *See* Dep. Tr. of Dr. Patrick Smith at 66; Dep. Tr. of Dr. Bookwalter at 44; *see also* Dep. Tr. of Dr. Bookwalter at 48 ("Smokers are four times more likely to be symptomatic from degenerative disk disease than non-smokers, and we have been able to determine that simply stopping smoking can diminish pain complaints by about 30 percent."). Considering this testimony and evidence, the Court finds that a reasonable person in the position of Plaintiff would have heeded medical advice and stopped smoking in order to minimize his damages.

Plaintiff failed to take this step. Accordingly, the Court will take this finding into consideration when calculating any award of damages to Plaintiff.

**B. CONCLUSIONS REGARDING RECOVERABLE DAMAGES**

63. Plaintiff demands damages for the "medical expenses, pain and suffering, humiliation, loss of pleasures of life and disfigurement" that he sustained as a result of the accident. *See* ECF No. 111 at 29; *see also* ECF No. 1-2 at 5-6.

64. The parties agree that medical expenses incurred by Plaintiff due to his post-accident medical treatment total $78,028. Of that amount, approximately $34,000 is attributable to the first post-accident surgery and related medical expenses. *See* ECF No. 112-1 (itemizing the costs associated with the first fusion procedure); *see also* Pl.'s Trial Ex. 14 ("Medical Expenses Exhibit").[16]

65. The damages recoverable by Plaintiff in the UIM phase are those medical expenses incurred for the diagnosis, treatment, and/or cure of his injuries related to the accident and the noneconomic loss sustained (*i.e.*, pain and suffering, embarrassment and humiliation, the loss of ability to enjoy pleasures of life, and disfigurement) due to that collision. *See generally Davis v. United States*, CIV. A. 94-1457, 1995 WL 299014 (E.D. Pa. May 16, 1995) (citing *Catalano v. Bujak*, 642 A.2d 448 (Pa. 1994)) (discussing damages under Pennsylvania tort law); *c.f. Lovett v. Weeks Marine Inc.*, 99 F. App'x 428, 430 (3d Cir. 2004) ("There is no requirement that an award must be broken into its component parts. A lump sum award of damages is within the discretion of the trial court.") (citing *Neill v. Diamond M. Drilling Co.*, 426 F.2d 487, 490 (5th Cir. 1970)).

---

16. After the $34,658.11 in costs attributable to the first surgery is deducted, the remainder amounts to $43,369.89 in medical expenses. The Court has compared the itemized amounts in the Medical Expenses Exhibit (Pl.'s Trial Ex. 14) with the exhibit listing the costs for the first fusion procedure (ECF No. 112-1), and it has attempted to parse out which treatment/expenses are respectively attributable to the second and third surgeries based on the date(s) and diagnosis description(s). From the Court's best estimate, the second and third surgeries each comprise roughly one-half of the remainder, but it is often difficult to decipher precisely which treatment (*e.g.*, the pain injections) should be attributed a particular condition/symptom.

Taking into account Plaintiff's failure to mitigate his damages, the Court will award Plaintiff $55,000 for those costs reasonably incurred for the diagnosis and treatment of his accident-related injuries and will award Plaintiff an additional $50,000 in damages for noneconomic loss due to the collision.

66. Plaintiff has waived his right to seek damages for permanent injury. *See* Trial Tr., ECF No. 115 at 57 ("THE COURT: Let me ask this question: Are you seeking damages for a permanent injury that you previously stipulated you were not seeking damages for a permanent injury? [PLAINTIFF'S COUNSEL]: I suppose I cannot do that if I stipulated I am not seeking permanent injury, then no."); Am. Mot. in Limine, ECF No. 88 at 2 (noting "Plaintiff's inability to prove or assert permanent injuries"). Accordingly, the Court finds and rules that Plaintiff may not recover any damages for permanent disfigurement (*e.g.*, the ventral hernia) or for any other permanent injury.

67. The parties dispute whether Plaintiff is entitled to recover damages for any future expenses. Defendants argue that any damages awarded should extend only through the time of trial. In support, Defendants submit that "[a]lthough Dr. [Patrick] Smith testified that [P]laintiff is probably going to need pain management for five to ten years or so, he provided no basis for this opinion and the opinion is inherently speculative regardless of the fact that [he] is an expert witness." ECF No. 118 at 7. *See* Dep. Tr. of Dr. Patrick Smith at 36 ("He's probably going to need [pain management] for quite some time, maybe, you know, five, ten years or so. He'll probably need some type of treatments and something to address some of the pain he has in his back."). The Court finds that Plaintiff is not entitled to be compensated for the speculative expenses he may incur in the future for the alleged treatment and care of his injuries.

68. Plaintiff has no lost wages or future earning capacity, as he was completely disabled before the motor vehicle accident and remains in that condition at present.

69. In sum, the Court finds that the total damages sustained by Plaintiff as a result of the October 2009 motor vehicle accident altogether total $105,000 and that this amount fairly and adequately compensates him for the injuries and loss incurred. Therefore, as the policy limits of the Erie automobile insurance policy total $50,000, Plaintiff was an underinsured motorist.

70. The Court will reduce the total amount of damages recoverable by $50,000 to reflect the credit to which GEICO is entitled. Accordingly, the Court will enter a verdict and in favor of Plaintiff and against GEICO in the amount of $55,000. Because this award does not exceed $300,000, the Court will also enter judgment in favor of Allied and Electric.

### III. THE BAD FAITH PHASE

#### A. FINDINGS OF FACT

1. After exhausting third-party benefits of the tortfeasor's insurance company, Plaintiff asserted a claim to recover the policy limits pursuant to the UIM coverage that was in effect under the automobile insurance contract between Derubeis and GEICO.

2. Through counsel, Plaintiff filed an UIM claim with GEICO in late October 2010. Counsel later forwarded medical records from some of Plaintiff's providers and made a demand upon GEICO for the $300,000 limits of the UIM coverage under the policy.[17]

3. The claim was assigned to GEICO Claim Examiner Kathy Carmine. GEICO called Carmine as a witness at trial during the bad faith phase. Carmine has been employed by GEICO for nearly twenty years throughout its various divisions, such as sales and service, mechanical breakdown claims, overseas insurance, and personal injury claims. Carmine had handled

---

17. In a letter from Plaintiff's counsel to Carmine dated November 5, 2010, he states that medical records are enclosed from UPMC St. Margaret, Dr. Patrick Smith, Penn Hills EMS, AGH, Dr. Gregory Smith, and Forbes Regional Hospital as well as a narrative report from Dr. Patrick Smith. *See* Trial Ex. 24.

Pennsylvania automobile claims for roughly two years, including those that involved neck and back injuries, when Plaintiff filed for UIM benefits. As such, Carmine was familiar with the medical terminology relating to neck and back injuries. The Court found her testimony credible.

4. Once the claim was assigned to Carmine, she reviewed the documents in the file and listened to the recorded statements of Derubeis and Plaintiff. Carmine described the contents of the file as "medicals," a police report, and a recorded statement.

5. After her initial review, Carmine called counsel for Plaintiff to inquire about whether he intended to submit additional medical records. Counsel agreed to submit supplemental medical records. Based on this apparent mutual understanding, Carmine did not request pictures of the vehicles, the pre-accident medical records of Plaintiff, or a third-party authorization form as she relied solely on counsel's representation that he would provide any pertinent documents. Carmine does not recall receiving any additional documents from counsel while assigned to this claim.

6. From the available medical records, Carmine learned that Plaintiff had multiple prior accidents, neck and back surgeries, degenerative conditions, and other physical ailments such as multiple sclerosis and fibromyalgia. Carmine concluded that Plaintiff suffered an aggravation of his preexisting conditions in the October 2009 accident. As part of this review, Carmine did not consult with the staff nurse employed by GEICO.

7. Carmine corresponded with Plaintiff's counsel by telephone on several occasions, including a discussion regarding the amount Erie Insurance had available to cover its insured/the tortfeasor. Counsel for Plaintiff initially misinformed Carmine that Hurayt's policy limit was $100,000, but Carmine learned later that the policy limit was actually $50,000. The parties took some time to resolve this issue.

8.  In late-February 2011, Carmine extended an offer of $10,000 to counsel for Plaintiff to resolve his UIM claim.  Carmine made this offer with the understanding that GEICO would receive a credit for the $50,000 payment made by Erie and thus assigned a gross value of $60,000 to this claim.  This offer was never presented as a final offer.

9.  Carmine based the initial offer/gross valuation on her experience in handling claims and the preexisting conditions of Plaintiff including his degenerative issues; however, she was not aware of the full extent of Plaintiff's pre-accident medical symptoms or procedures, operating under the mistaken belief that he only had two pre-accident back surgeries.  Carmine believed that she was aware of the two post-accident lumbar surgeries when she made the offer, but cannot recall if those procedures or any related expenses factored into the gross valuation.  Those factors not considered in the valuation were Plaintiff's multiple sclerosis, fibromyalgia, and smoking habit.

10. Plaintiff refused the offer and continued to demand the policy limits of $300,000.

11. Carmine later increased the offer to $13,000 after she received notification of a $2,700 medical lien from Plaintiff's counsel in early-March 2011.

12. Plaintiff again refused the offer and repeated his demand for the policy limits.  Indeed, Plaintiff never deviated from that demand during the entire time Carmine handled this claim.

13. After Plaintiff filed suit in August 2011, the file was transferred to a different claims adjuster.

14. .Throughout the claims process, Carmine was supervised by her manager Lori Workman.  GEICO called Workman as a witness at trial during the bad faith phase.[18]  The Court found her

---

18.  Workman reviewed the Activity Log for Plaintiff before she testified and admitted that she did not have an independent recollection of his claim.  Contrary to many of the proposed findings of fact submitted by Plaintiff, Workman could only speculate on a host of issues.  Workman only assumed that GEICO did not consider the surgeries as related to the accident; that GEICO only received records of medical expenses related to the $2,700 lien

28

testimony credible. Workman has been employed by GEICO for almost twenty years and acted as a supervisor in the "continuing unit" for about one year when Plaintiff filed his claim. The continuing unit handles all of the litigation, serious bodily injury, and UIM claims submitted to GEICO. Workman does not have a medical background, although she is comfortable reading, reviewing, and analyzing medical records given her experience and training at GEICO.

15. The Activity Log reflects that Workman first became involved when the UIM portion of Plaintiff's claim was assigned to Carmine who prepared a summary of the claim for review by her supervisor. After her review, Workman expressed no concern that would have required immediate management involvement.

16. As part of the normal course of the claims process, Workman discussed the case with Carmine at some juncture a few months after the initial review. Workman does not recall the specifics of their conversation but surmised that they would have reviewed the liability aspects of the claim, the details of the accident, the alleged injuries and supporting documentation, the work history of the claimant, the amount received from the tortfeasor's insurance carrier, and settlement authority. Carmine could not extend an offer without first speaking to management and obtaining approval.

17. Workman initially gave Carmine the authority to settle the case for $25,000, fully aware that GEICO was entitled to a $50,000 credit.

18. Roughly two months after that offer was made, Carmine conducted a scheduled reserve review of the claims file for Plaintiff. As the name suggests, a scheduled reserve review is a periodic assessment of a claims file which an adjuster and supervisor must complete to ensure that the amount set aside for the anticipated value and potential expenses of the case is adequate.

---

when it made the initial offer; and that GEICO was now in receipt of and reviewed all of Plaintiff's medical records and expenses. Among many other facts, Workman also was not aware of the expert reports or opinions that Plaintiff required his second post-accident surgery because the first fusion failed.

The reserves do not mirror the settlement authority amount but are typically set around the valuation of the case when the potential expenses are also taken into consideration, such as defense costs, court reporter fees, deposition expenses, etc. During the review, Workman noted that the Plaintiff had preexisting issues with his back and cervical spine which required surgery and the need to obtain his pre-accident medical records. Workman never had any of those records during the time in which she and Carmine handled this claim.

19. Workman reassigned the claim to another adjuster when the lawsuit was filed, but her involvement otherwise ended at that time. Both Workman and Carmine understood that GEICO owed a duty of good faith to Plaintiff while they handled his claim, and they acknowledged that the receipt of information which increases the value of a claim could result in a higher offer by GEICO.

20. Since this litigation commenced, GEICO has increased its offer by $7,000 to $20,000 for a gross valuation of $70,000 when the credit is added and Plaintiff has lowered his demand to $275,000. That increase was made on the eve of trial.

## B. CONCLUSIONS OF LAW

21. The remedy for a claim based on an insurer's bad faith conduct against its insured is recognized by statue in Pennsylvania, 42 PA. CONS. STAT. ANN. § 8371. *See Smith v. State Farm Mut. Auto. Ins. Co.*, 506 F. App'x 133, 136 (3d Cir. 2012). Pennsylvania's bad faith statute provides that:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

42 PA. CONS. STAT. ANN. § 8371. Although undefined in the statute, courts have interpreted "bad faith" on part of the insurer as

> any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (*i.e.*, good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

*Nw. Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 137 (3d Cir. 2005) (citing *Terletsky v. Prudential Property and Casualty Ins. Co.*, 649 A.2d 680 (Pa. Super. Ct. 1984)). *See id.* ("We have predicted that the Pennsylvania Supreme Court would define the term according to the definition set forth by the Pennsylvania Superior Court in *Terletsky*.); *see also Jurinko v. Med. Protective Co.*, 305 F. App'x 13, 20 (3d Cir. 2008) (noting that Pennsylvania and federal courts have recognized this definition as the "universally acknowledged meaning").[19]

---

19. Relying on *Romano v. Nationwide Mutual Fire Insurance Company,* 646 A.2d 1228 (Pa. Super. Ct. 1994), Plaintiff submits that the Court may look to the following sources in determining whether an insurer has acted in bad faith under § 8371: other cases construing the statute and the law of bad faith in general; the plain meaning of the terms and the statutes; and/or other statutes addressing the same or similar subjects. *See* ECF No. 111 at 31. Plaintiff proceeds to cite the Unfair Insurance Practices Act ("UIPA") to demonstrate various acts by an insurer that constitute "an unfair method of competition or any unfair or deceptive act or practice in the business of insurance." *See id.* at 32. The United States Court of Appeals for the Third Circuit has expressed serious doubt regarding the continued import of the rule of construction announced in *Romano. See Dinner v. United Servs. Auto. Ass'n Cas. Ins. Co.*, 29 F. App'x 823, 827 (3d Cir. 2002). As the court of appeals explained:

> Prior to *Terletsky v. Prudential Property and Casualty Ins. Co.*, 649 A.2d 680 (Pa. Super. Ct. 1984), the Pennsylvania Superior Court had looked to the UIPA and the UCSP to give content to the concept of bad faith as used in 42 PA. CONS. STAT. § 8371. *See, e.g., Romano v. Nationwide Mutual Fire Insurance Company,* 646 A.2d 1228 (Pa. Super. Ct. 1994). *Terletsky* did not, however, and it is apparent from a comparison of the bad faith standard it adopted with the provisions of the UIPA and the UCSP that much of the conduct proscribed by the latter is wholly irrelevant to whether an insurer lacks a reasonable basis for denying benefits and, if so, whether it knew or recklessly disregarded that fact.

*Dinner v. United Servs. Auto. Ass'n Cas. Ins. Co.*, 29 F. App'x 823, 827 (3d Cir. 2002). Thus, as the court concluded, "[i]t necessarily follows that a violation of the UIPA or the UCSP is not a per se violation of the bad faith standard." *Id.*

22. To recover on a bad faith claim under Pennsylvania law, a plaintiff must show that "(1) that the defendant did not have a reasonable basis for denying benefits under the policy; and (2) that the defendant knew or recklessly disregarded its lack of reasonable basis in denying the claim."[20] *Keefe v. Prudential Prop. & Cas. Ins. Co.*, 203 F.3d 218, 225 (3d Cir. 2000) (quoting *Terletsky*, 649 A.2d at 688). *See Luse v. Liberty Mut. Fire Ins. Co.*, CIV. 1:09-CV-1221, 2010 WL 2698342, at *4 (M.D. Pa. July 7, 2010), *aff'd*, 411 F. App'x 462 (3d Cir. 2011) ("While the cases usually speak in terms of the denial of benefits, '[f]ailure to conduct a reasonable investigation based on available information may' also support a claim of bad faith on the part of an insurance company.'") (quoting *Giangreco v. U.S. Life Ins. Co.*, 168 F. Supp. 2d 417, 423 (E.D. Pa. 2001)); *Brown v. Great N. Ins. Co.*, 3:07-CV-0322, 2009 WL 453218, at *4 (M.D. Pa. Feb. 23, 2009) ("Courts have not restricted § 8371 to an insurer's denial of a claim, allowing bad faith claims for other conduct, including an insurer's investigative practices.").

23. The "clear and convincing" standard requires the insured to also show "that the evidence is so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith." *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 367 (3d Cir. 2004). In making this evaluation, a court must bear in mind that "'[b]ad faith claims are fact specific and depend on the conduct of the insurer vis-à-vis the insured.'" *Condio v. Erie Ins. Exchange*, 899 A.2d 1136, 1143 (Pa. Super. Ct. 2006), *appeal denied*, 912

---

20. Although the definition of "bad faith" adopted in *Terletsky* refers to a "motive of self-interest or ill will," the United States Court of Appeals refrained from creating a third element of improper purpose. *See Klinger v. State Farm Auto. Ins. Co.*, 115 F.3d 230, 233-34 (3d Cir. 1997). The *Klinger* Court rejected that language as dictum and held that a plaintiff must only satisfy the two-part test set forth in *Terletsky*. *See id.* at 234 ("In our prediction of how the Pennsylvania Supreme Court would measure bad faith claims, we will rely on the actual test that *Terletsky* applied and refrain from creating a third part based only on dictum quoted from *Black's Law Dictionary*."). After the Pennsylvania Superior Court addressed this issue, our court of appeals later clarified that "'the motive of self-interest or ill will' of the insurer, while not a third element, 'is probative of the second element . . . .'" *Jurinko v. Med. Protective Co.*, 305 F. App'x 13, 21 (3d Cir. 2008) (quoting *Greene v. United Servs. Auto. Ass'n*, 936 A.2d 1178, 1190-91 (Pa. Super. Ct. 2007)) (citing *Employers Mut. Cas. Co. v. Loos*, 476 F. Supp. 2d 478, 490-91 (W.D. Pa. 2007)).

A.2d 838 (Pa. 2006) (quoting *Williams v. Nationwide Mutual Ins. Co.*, 750 A.2d 881, 887 (Pa. Super. Ct. 2000)). *See Smith v. Allstate Ins. Co.*, 904 F. Supp. 2d 515, 524 (W.D. Pa. 2012) (observing the "broad range of insurer conduct" that will support a bad faith claim includes an unreasonable delay in handling claims, a frivolous or unfounded refusal to pay and a failure to communicate with the insured, an inadequate investigation or failure to perform adequate legal research concerning a coverage issue, an unreasonable interpretation of the policy provisions, and a blatant misrepresentation of the facts or policy provisions) (citations omitted).

24. The Pennsylvania Superior Court has examined the application of § 8371 to UIM and uninsured motorists benefit claims (together, "U-claims"):

> Pennsylvania law holds insurers to a duty of good faith and fair dealing toward their insureds, without distinguishing between first party and third party settings . . . . U-claims contain elements of both first party and third party claims. We see no reason, therefore, to impose a different duty on an insurance company in a U-claim setting. While the legal relationship of the parties may change in the context of a U-claim, *i.e.*, become adversarial, the insurer's duty does not change. We hold that, when faced with a U-claim, an insurance company's duty to its insured is one of good faith and fair dealing. It goes without saying that this duty does not allow an insurer to protect its own interests at the expense of the insured's interests. Nor does it require an insurer to sacrifice its own interests by blindly paying each and every claim submitted by an insured in order to avoid a bad faith lawsuit.

*Condio*, 899 A.2d at 1144-45.[21] *See also Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 523 (3d Cir. 2012) ("While an insurer has a duty to accord the interests of its insured the same consideration it gives its own interests, 'an insurer is not bound to submerge its own interest in order that the insured's interests may be made paramount, and an insurer does not act in bad faith by investigating and litigating legitimate issues of coverage.'") (quoting *J.C. Penney*, 393 F.3d at

---

[21]. Plaintiff contends that "[a] heightened duty of good faith is necessary in first party claims due to the special relationship between an insurer and its insured and the very nature of the insurance contract." ECF No. 111 at 33. The Superior Court of Pennsylvania expressly rejected that approach. *See Zappile v. Amex Assur. Co.*, 928 A.2d 251, 256 (Pa. Super. Ct. 2007) ("The notion of a higher duty to a first party claimant was also specifically rejected by our Court in *Condio*.").

368). "[B]ad faith is actionable regardless of whether it occurs before, during or after litigation." *W.V. Realty, Inc. v. Northern Ins. Co.*, 334 F.3d 306, 313 (3d Cir. 2003) (citation omitted).

25. To be sure, "mere negligence or bad judgment is not bad faith." *Nw. Mut. Life Ins. Co.*, 430 F.3d at 137 (quoting *Brown v. Progressive Ins. Co.*, 860 A.2d 493, 501 (Pa. 2004)). *See., e.g.*, *Lehman v. Victoria Fire & Cas. Ins. Co.*, CIV.A. 09-1542, 2011 WL 2457928, at *10 (W.D. Pa. June 16, 2011) ("In hindsight, although these and the other so-called 'inadequacies' in the investigation could be considered negligent or indicative of poor judgment, they are insufficient to sustain a bad faith claim."). Bad faith also "is not present merely because an insurer makes a low but reasonable estimate of an insured's damages.'" *Smith*, 506 F. App'x at 136 (quoting *Johnson v. Progressive Ins. Co.*, 987 A.2d 781, 784 (Pa. Super. Ct. 2009)). *Zappile v. Amex Assur. Co.*, 928 A.2d 251, 261 (Pa. Super. Ct. 2007) ("[T]he trial court found that AMEX improperly undervalued the claim. As evidence of this, the trial court points to the $105,000 total award, which is roughly $70,000 more than the offer. A difference between the offer and the amount awarded is not, by itself, evidence of bad faith."); *c.f.*, *Seto v. State Farm Ins. Co.*, 855 F. Supp. 2d 424, 430 (W.D. Pa. 2012) ("[L]ow-ball offers which bear no reasonable relationship to an insured's actual losses can constitute bad faith within the meaning of § 8371.") (citing *Brown*, 860 A.2d at 501). Similarly, an insurer does not engage in bad faith when it negotiates with its insured by making low settlement offers based on the subjective and uncertain nature of a claim. *See Kosierowski v. Allstate Ins. Co.*, 51 F. Supp. 2d 583, 590-92 (E.D. Pa. 1999), *aff'd*, 234 F.3d 1265 (3d Cir. 2000).

26. Nor can bad faith hinge on whether an offer is less than the reserve(s) or on an award exceeding the offer. *See e.g.*, *Johnson v. Progressive Ins. Co.*, 987 A.2d 781, 785 (Pa. Super. Ct. 2009) ("The [$75,000] award was actually lower than [the $100,000] demand and represented a

middle ground between the [$25,000] offer and the demand.  It certainly bore no resemblance to the award made in *Hollock*, which was twenty-nine times higher than the insurer's offer.").

27. As our court of appeals has explained, "[e]ven questionable conduct giving the appearance of bad faith is not sufficient to establish it so long as the insurer had a reasonable basis to deny coverage."  *Post*, 691 F.3d at 523 (citing *J.C. Penney*, 393 F.3d at 368 ("affirming summary judgment in insurer's favor on bad faith claim because there was a reasonable basis to deny coverage, even though insurer took inconsistent coverage positions in other situations and made false statements in its marketing materials")).  Indeed, "[a] reasonable basis is all that is required to defeat a claim of bad faith."  *J.C. Penney Life Ins. Co.*, 393 F.3d at 367 (citing *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 307 (3d Cir. 1995)).  *See, e.g.*, *Luse*, 2010 WL 2698342, at *5 ("Plaintiffs cite to no case law suggesting they must conduct some heightened investigation.  This is particularly true in light of the fact that Plaintiffs did not initially apprise Liberty of the extent of Mr. Luse and his grandson's respiratory complications."); *McCullough v. Nw. Mut. Life Ins. Co.*, 2:05CV0105, 2007 WL 4440954, at *4 (W.D. Pa. Oct. 24, 2007) ("[C]ourts have found that a reasonable investigation has occurred even though some medical testing may have been inadequate, and even where the physicians disagreed as to whether the plaintiff was disabled.") (citing *Seidman v. Minnesota Mut. Life Ins. Co.*, 40 F. Supp. 2d 590 (E.D. Pa. 1997)); *see also Employers Mut. Cas. Co. v. Loos*, 476 F. Supp. 2d 478, 496 (W.D. Pa. 2007) ("[T]he presence or absence of bad faith does not turn on the legal correctness of the basis for an insurer's denial of an insured's claim."); *Krisa v. The Equitable Life Assurance Soc'y*, 113 F.Supp.2d 694, 704 (M.D. Pa. 2000) ("The insurance company also is not required to show the process by which it reached its conclusion was flawless

or that the investigatory methods it employed eliminated possibilities at odds with its conclusion.") (citation omitted).

28. Here, Plaintiff contends that GEICO failed to conduct a reasonable investigation and otherwise acted in bad faith by taking inconsistent positions, offering a paltry sum despite evidence that the claim was worth more, and forcing him to litigate an otherwise meritorious claim. The Court does not agree and cannot conclude that Plaintiff has met his burden to show clear and convincing evidence that GEICO acted in bad faith.

29. As a threshold matter, Plaintiff has not shown that GEICO failed to conduct a reasonable investigation. Carmine timely reviewed the file and medical records provided by Plaintiff with the understanding that they would be appropriately supplemented over time by his counsel. This mutual agreement apparently went unfulfilled, and the record is still fairly unclear on what pre-accident records (if any) were ever supplied to Carmine.[22] Those records she did receive and review apparently illustrated an individual with preexisting conditions and chronic medical problems abound: multiple prior surgeries, degenerative issues, physical ailments, and chronic pain conditions. Carmine proceeded to discuss the claim with her manager and they based the valuation on the facts before them at that time. Carmine then made an initial offer of $10,000 and later adjusted the amount to reflect a medical lien, fully understanding that GEICO was entitled to a $50,000 credit. Plaintiff often glosses over this critical fact and focuses his attention on the less-than-perfect handling of the claim. The conduct of GEICO is certainly not free from criticism in its initial handling of the claim—Carmine mistook the number of Plaintiff's pre-accident procedures and may have overlooked the second lumbar procedure, GEICO initially

---

22. The record reflects that GEICO did not receive many of the records until the parties were immersed in this litigation. The Activity Log indicates that GEICO received records from Dr. Gregory Smith and Dr. Paul Lieber on February 6, 2012, the social security filed on June 6, 2012 and the records from Dr. Bonarati and the report of Dr. Patrick Smith on July 27, 2012.

reported that Plaintiff had limited tort coverage, and there are inconsistent statements regarding how the valuation was reached—but the Court finds that this conduct is more indicative of poor judgment than bad faith. Thus, even if GEICO could be faulted for failing to make a more thorough inquiry into Plaintiff's preexisting and post-accident medical condition(s), Plaintiff has not met his burden to show clear and convincing evidence of bad faith.

30. Plaintiff has not shown that GEICO acted in bad faith by making low settlement offers. The relatively low offer(s) by GEICO ostensibly reflected its position that Plaintiff's damages were not worth anything near the $300,000 demand and that the relatedness of his injuries were questionable. Plaintiff makes much ado about the fact that GEICO has never offered the full extent of the reserves, but he fails to explain why GEICO was obligated to offer the entire reserve amount(s) or to account for the fact that they comprise the total valuation of a case such as potential litigation-related expenses. Plaintiff also takes issue with the fact that the offer and reserves were never raised beyond $25,000 even after GEICO received information that indicated it was responsible for the first surgery and related medical expenses in the amount of roughly $34,000. Whether GEICO had a reasonable basis for not increasing the offer at that juncture is questionable, but there is no evidence that it was motivated by self-interest or ill will to support a conclusion that it knew or recklessly disregarded its lack of reasonable basis.

31. Plaintiff has not shown that GEICO acted in bad faith by choosing to litigate the relatedness of the damages to the accident rather than accede to his demand. To the Court, there was an honest dispute between the parties regarding the valuation of this claim that resulted in a stalemate, even though the parties could have been somewhat more reasonable at the negotiation table. Reasonable minds can differ as to the value of this claim, particularly when the noneconomic damages comprise the largest component of the amount demanded. Thus, GEICO

was within its right to refuse to settle this claim at the outer limits of the policy—where the offer remained throughout this litigation—given the uncertainty of the damages sustained by Plaintiff.

32. And Plaintiff has also not shown that GEICO's refusal to extend its offer beyond $20,000 (for a total valuation of $70,000) on the eve of trial constituted bad faith. From GEICO's perspective, the last offer bore a reasonable relationship to the loss sustained by Plaintiff: the $34,000 in medical costs plus noneconomic damages related to the first post-accident surgery. Even though the Court has found that Defendants are responsible for the third post-accident surgery, GEICO properly gave credence to and relied upon the IME report of Dr. Bookwalter in excluding the cervical procedure from its valuation. Accordingly, the Court finds that GEICO had a reasonable basis for this offer.

33. By all accounts, the moving force behind this litigation was the dispute over the measure of damages. Throughout, the settlement tactics struck a familiar cord: GEICO made low but not unreasonable offers; Plaintiff responded with a demand at the policy limits of the claim. Neither party budged until the eve of trial but to no avail. This Court was tasked with resolving the dispute and has found that Plaintiff is entitled to significantly more than the offer but surely less than the demand and concluded that GEICO's handling of the claim was less than optimal. But imperfection is not bad faith. Bad faith instead requires evidence so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, that the insurer acted unreasonably and that it knew or recklessly disregarded its lack of a reasonable basis. Plaintiff has not made this showing. The Court will, therefore, find in favor of GEICO and against Plaintiff in the bad faith aspect of this case.[23]

---

23. Based on this ruling, the Court need not discuss the bill submitted by Plaintiff's counsel for attorney's fees.

## IV.    CONCLUSION

For the reasons hereinabove stated, the Court concludes that Plaintiff is entitled to UIM benefits from GEICO and that GEICO did not act in bad faith in handling the claim of Plaintiff. This award does not implicate either Allied or Electric.  Accordingly, a verdict and judgment are hereby entered in favor of Plaintiff and against GEICO at Count I for the amount set forth in this Memorandum Opinion; and in favor of Defendants and against Plaintiff at Count II-IV.

An appropriate Order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **NICHOLAS SCHIFINO,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **2:11-cv-1094** |
| **v.** | ) |
| | ) |
| **GEICO GENERAL INSURANCE COMPANY,** | ) |
| *a corporation*, **ALLIED INSURANCE** | ) |
| **COMPANY** and **ELECTRIC INSURANCE** | ) |
| **COMPANY**, | ) |
| | ) |
| **Defendants.** | ) |

## ORDER OF COURT

AND NOW, this 13th day of December 2013, in accordance with the foregoing Findings of Fact and Conclusions of Law, it is hereby **ORDERED, ADJUDGED and DECREED** that a verdict and judgment in this action is hereby entered (1) in favor of Plaintiff Nicholas Schifino and against Defendant Geico General Insurance Company on the claim set forth at Count I of the Complaint; (2) in favor of Defendant Geico General Insurance Company and against Plaintiff Nicholas Schifino on the claim set forth at Count II of the Complaint; (3) in favor of Allied Insurance Company and against Plaintiff Nicholas Schifino on the claim set forth at Count III of the Complaint; and (4) in favor of Electric Insurance Company and against Plaintiff Nicholas Schifino on the claim set forth at Count IV of the Complaint.

Plaintiff Nicholas Schifino is entitled to monetary damages from Defendant Geico General Insurance Company in the amount of $55,000.

BY THE COURT:

s/Terrence F. McVerry
United States District Judge

cc:    **Richard C. Levine, Esquire**
       Email: rlevine@aldlawfirm.com

       **Joseph A. Hudock, Jr., Esquire**
       Email: jhudock@summersmcdonnell.com

       **James F. Andrews , Jr., Esquire**
       Email: Andrewj1@Nationwide.com

       **Alan Wolfson, Esquire**
       Email: awolfson@chartwelllaw.com

       (via CM/ECF)